Six cases on today's argument calendar, and we will begin in Appeals No. 23-2714 and 24-1029, Signal Funding v. Sugar Felsenthal and others. Sir, is it Gekas? Gekas. Gekas, good morning. Nice to see you. All right. I see you. Thank you, Your Honor. Good morning. And I am Chris Gekas. May it please the Court. I don't really have much to add unless the Court has questions to our briefs. I think the necessary beginning has to do with the question of jurisdiction, because there are two appeals here. Without getting into the details, we think that the, as we argue in our jurisdictional statement, we think that the 23-numbered case is moot. It was inelastic. I'm sorry. Could you bleep down there for a minute? You think what is mooted? We think that the 23-numbered case, 2714 is it, is mooted by the second appeal, which is from the final judgment. In the first appeal, Judge Lefkoe certified an interlocutory order and left pending against the original defendant in the case claims that were then delayed for trial. We filed a lengthy jurisdictional statement in the 23 case, and then the case below proceeded to final judgment, so we lodged another appeal, and this Court consolidated them. And all the issues that were present in the interlocutory appeal are even more perfected in the second appeal, so we don't think that Your Honors have to go there. They're not all folded together? I'm sorry? They're not all folded together? They are. We think that the issues are amplified in at least a factual manner in legal questions by the resolution. There's a series of questions that we didn't really deal with in the jurisdictional statement that has to do with the fact that no final judgment was entered as the interlocutory rule. So one of the questions is, what's the record are you looking at? The certification came several months after the ruling that was being certified, so what is the record? Is it the record as of the original order that's being appealed from? Is it the record from the date of the certification? What's the implication of the fact that the district court did not enter a final judgment? All of those things now go away, we think. So the Rule 54B ruling would capture everything, is your opinion? Well, I guess the answer is sort of. We really haven't, because we believe the case is moot, we really haven't delved into the question of what is the distinction between the two appeals. We think that everything is subsumed in the appeal from the final judgment. That's what we think. There are a series of procedural irregularities and other confused circumstances that would make the jurisdictional issue in the first case more difficult. Yeah, let me ask you this, Mr. Geekus. Are you raising this because you think it makes a difference? Well, I raise it because of the fear that any litigator has about taking some kind of a step in a case that has unforeseen circumstances or an unforeseen result. Once you lodge an interlocutory appeal, if you don't lodge an appeal from the final judgment, you're out of luck. There's a series of rules that seems to turn everything about from you on its head. Yeah. And so, we think . . . I mean, I appreciate you raising it. I raise this question essentially because of my view that the court typically starts with the jurisdictional problem. Yeah, no, that's fair, and we appreciate it. I mean, we are a court of limited jurisdiction. I'll tell you, and you can push back on this, I might be mistaken. I thought that you have the 54B, partial summary judgment, that's as clear as day. And then what happens is the 24-1029 is the order that kind of wraps everything else up that was lingering. My words, not anybody else's words. And therefore, there's complete closure between the two docket numbers vis-a-vis the district court, and it just all comes to us as a complete package, if you will. But I don't want to . . . if you think, no, that's mistaken, and that view would have an adverse consequence for my client, that would be very helpful to hear. No, our view about it is if the opinion in this case comes out captioned with both numbers without a concern about the difference between the jurisdiction, the power of the court, that would be fine with us. I raised this because of my review of some of the law, which I can't cite to Your Honor today because it's irrelevant to the argument, about the court being very, very concerned about appellate jurisdiction, and when there are two numbers, I think there's a series of decisions that grapple with that. I didn't want to let it go unanswered because jurisdiction is the first thing that we have to deal with. I think those cases are factually distinguishable, where there are two appeal numbers. Say again, Your Honor? I think the cases that you might be referring to are factually distinguishable, given the Rule 54B ruling here and the final judgment. Yeah, I'm sure that's correct. I'll say it a little bit differently. I think that they can be distinguished factually, and what we have always been concerned about is to make sure that we didn't trip over some distinction between the cases that didn't occur to us that would cause, you know, we could have dismissed the first appeal. That would have been one thing we did for lack of jurisdiction, and we're not going to do that. A lawyer who does that without hearing from the court about jurisdiction, it's a dangerous thing to do because you'd be very concerned about the effect of it on the final appeal. Okay, why don't you proceed to the merits. We'll sort out the appellate jurisdiction issue. All right. On the merits, we really don't have much to say in addition to our brief. I think there are sort of two main substantive issues that have to do with the question of the dismissal of the appeal of the Second Amendment complaint, which appears entirely in our separate appendix, and the dismissal of the fraud and fraudulent concealment cases. And we think that the defect in what the district court did is very close to the defect in what the district court did in granting summary judgment on the question of damages in the malpractice claim that remained against the lawyers, the law firm defendants. That's what is up here before your eyes. Mr. Gekas, can I clarify one of your arguments? Is it, because it's not clear to me from the briefing, is it your position that even if there was no adverse relationship between your client and Ms. Jaffrey, that Sugar still had to disclose any representations of her? Well, I guess the answer to that is probably not, because it's unequivocally, we don't have to get to that point. That's not the question. I'm just trying to clarify, if it's your position that Sugar needed to disclose to you non-adverse representations of Ms. Jaffrey? Well, I think the answer to that is complicated by our view that there's no question that there's adversity. If, for example, Sugar fell— Let's assume there are representations that are not adverse. Yeah, like a DUI case. Whatever it might be. Assume there are representations that are not adverse to your client. Is it your position that Sugar had to disclose those to your client? Well, I think, Your Honor, to the extent that there was some kind of effect of the non-adverse discrimination on— Discrimination? I'm sorry. The non-adverse representation. If there was some effect on the representation, the answer to that is yes, but let's take the hypothetical that I just raised. How ethically, if it's non-adverse, under Illinois ethics rules, how could they have to disclose that? In fact, wouldn't it be a violation to Ms. Jaffrey if they did disclose it? Well, the contract between the parties and the rules require the disclosure of a conflict. Rules require a disclosure of adverse representation, not a conflict. And it even says that you can be economic competitors. What the rules of ethics require would be a disclosure of any adverse representation. The hypothetical that you frame is one that is without a factual context. And the answer to that is—that generalized hypothetical is we do not claim the requirement to disclose non-adverse representation. The hypothetical that I just raised would be a DUI. If they're representing her on a DUI, do they have to disclose this to us? The answer is, if it has no— I'm not debating what might or might not be adverse. So you're throwing in facts, trying to say what is or isn't adverse. I'm just—if it's not adverse to your client, your brief suggested to me that you thought it nonetheless needed to be disclosed. And I don't know how you can argue that under the ethics rules and the law. Well, I don't think that is our position. The reason— Okay, good. That's what I'm trying to clarify. I'm sorry to be evasive. I don't mean to be evasive, but I— I want to make sure I understand your position. Yeah. So you agree that if Sugar represented Ms. Jaffrey in a matter that was non-adverse to your client, that Sugar did not have a duty to disclose it? As a generalized theoretical matter, yes. I add on some conditions to that. If the non-adverse representation had some spillover collateral effect, it's all fact. What does that come from, spillover collateral? Well, I mean— How do you get that out of the rule, which is pretty straightforward? They have to be directly adverse. Okay. Well, you know, conflict and adversity are all fact-specific. And the rule is stated, however, in general terms. There's no question about it. When you ask me that question in a nonspecific manner, the way that you phrased it, in the terms of the rule, our position is not that they have to disclose a non-adverse representation. So wait, that was a double negative. Well— If they are not directly adverse, that there is no duty on Sugar's part to disclose the representation of Ms. Jaffrey. Also a double negative, and I do agree. Okay. Okay? Can I—Mr. Geekas, can I focus you on the fraudulent concealment claim? Sure. Okay. The district court, in dismissing that, did allow signal to go forward on the affirmative fraudulent misrepresentation theory. What I'm trying to figure out is what's the content of the fraudulent concealment claim that you have been unable to litigate as a result of the district court's dismissal? Well, we haven't been able to litigate the question of the fact that these folks falsely stated there was no adverse representation, falsely stated they did not represent— Well, hold on. That—okay. That's exactly what I thought you would say. Right. But when the district court said, you signal are allowed to go forward on a fraudulent misrepresentation—on the fraudulent misrepresentation dimension of this, isn't that—aren't they allowed to go forward on what you just said? I don't think so, Judge. The way that we read it, it was basically cutting it off at the pass entirely. We don't read it that way at all. We thought it was terminating—termination of that part of the claim that had to do with really two aspects. One of them has to do with the affirmative misstatements, we don't represent her on anything adverse, and the material omissions of the failure to say, oh, by the way, we are organizing a company— Did you litigate fraudulent misrepresentation claims in the district court? After dismissal, no. It was over. That's our view. We thought it was over. That's what the summary judgment is about, the fraudulent misrepresentation claims. No, no. When you say did we— Well, the did—so— The summary judgment—what happened here was that she dismissed the fraud and fraudulent conveyance. She dismissed it, and we think that ended it. She dismissed the fraudulent concealment, not the fraud. I'm sorry. No, I don't think that's right. Well, hold on. All right. I mean, I'm looking right at her opinion. Say again? I'm looking right at her opinion. Well, Your Honor, I'm going to reserve the rest of my time, and I'll take a look at it, but our opinion was that—our view was that she terminated everything in terms of fraud. All right. I'm going to reserve the rest of my time. Okay. Very well. Thank you. Can I—I want to ask you one more question on the factual side. Okay. It's this. What, in your view, does the record show regarding the very first date of contact between Ms. Joffrey and Sugar? Well, it's complicated because she was an officer of my client, both of my clients, and she was dealing with Sugar on matters related to my client's business. Okay. Contact vis-à-vis a new enterprise. Well, I think it was— Is it before or after September 28, 2017, when she left? It was the morning after. The 29th. Right, the morning after. What happened was is that she resigned abruptly on the evening of the 28th, and then the next morning, billing records show—and this is cited in our brief— billing records show that she had a one-hour call with all four of the individual defendants where they discussed this pre-settlement funding. There's a brief billing entry that's in the record. And we think that we don't—I'll say it this way. We don't have any evidence that the contact about her new business was before that date. Okay. That's what I was looking to clarify. We don't have any evidence. So that's the first affirmative proof we have about it. Thank you. Okay. Let's hear from Sugar's counsel. Thank you, Justices. May it please the Court, Counsel. My name is Amir Thomasby. Justices, I represent Sugar Felsenthal. And I'd like to start to address the fraud issue. You're correct, Justices. The fraud claim did go forward, and it went forward from October 20, 2017. October 20, 2017 is the date where Mr. Friedland from Sugar Felsenthal wrote an email saying, we don't represent Ms. Joffrey in anything adverse. And what Judge Levko said is from the October 20, 2017 date, if there were bills that were paid, if there was work that was done, then you can proceed. And ultimately, the evidence bore out that there was no work done for signal after that October 20, 2017 date. And there were no bills. They didn't bill signal for any work done, including the transition work that they did. And that's what her motion to dismiss ruling said, that the motion to dismiss is granted esterprodulent concealment and denied esterprodulent misrepresentation. That's exactly right. I mean, all you're doing is you're, without quoting from it, you're reading from pages 13 and 14 of the district court's order or at the appendix 15 and 16. Yeah, I am, Justice. I just wanted to clarify. No, yeah, absolutely. I mean, I don't think there's any question she allowed a fraudulent misrepresentation claim to go forward. And then what then happened in the litigation on that claim? On that claim is it bore out that there was no work done afterwards. The testimony from Mr. After the 20th? After the 20th. The testimony from both Mr. Garris, who is the general counsel for signal and all of the sugar fells and all people, the bills were produced and it showed that there was nothing done after that date. There were no misrepresentation. There were no further representations. In fact, after that date on October 27th of 2017, Mr. Friedland goes back to Mr. Garris and says, you know what? We spoke with Miss Joffrey. We do represent her on certain matters. And we don't think there's a conflict. And it goes back to what Justice Saini pointed out initially under rule 1.7. It's specifically bore out in comment six. If you represent people that are economically adverse, that doesn't create a duty to disclose the details of that representation. So that's once that evidence justice went through, then ultimately in summary judgment, justice or excuse me, Judge Lefkoe said there's not enough evidence to support the fraud. And did did sugar ever affirmatively say we do not represent her in any non adverse matters? I thought what sugar represented was we don't represent her in any adverse matters and we can't comment on anything else. That's exactly what the email says for Mr. Freeman. And was there any evidence that at any point after that email or before that they said we don't represent her in any non adverse? No, nothing like that. Um, can I, can I, um, do you have some affirmative points you want to make? No, but go ahead. All right. I'm, I want to, I just want to get the benefit of your, you know, the litigation very well. Um, as, as Mr. Uh, geek is does to that. And it's this Mr. Mr. Friedland had a deposition, right? Jonathan Friedland was deposed. Yes. Okay. So I'm asking a question about this narrative, um, on this motion to compel. Okay. My takeaway from the record is that he didn't really recall many things that were pertinent to the issues being litigated. Is that fair? I don't think that's completely fair. I think he did recall issues with the conflict and what he did with the conflict. I think it is correct that there were some timeline issues. Justice said he, he did not recall the specific timeline of this. Okay. And is it all, it is clear from the record, is it not that he, in fact, at some point read that narrative? I agree. He indicated that he reviewed the narrative. Okay. Um, but is it fair to take away from the overall, the overall record on this, that his having read that narrative, whenever he read it, did not refresh his recollection on the, the kind of non conflict matters that you were just referring to. That's exactly right. And he said, I went through this and nowhere did he say I used it to refresh my recollection. He says it was something I created, um, after he received, um, not to, I hope that answers your question directly, justice. You're right. He did not say this refreshed my recollection on X, Y, and Z. That was not his testimony. Yeah. I mean, the inference that, I mean, I just, just reading between the lines of all this, it hadn't refreshed his recollection. Then he would have been able to answer questions about these non conflict matters. That's exactly, whatever the answers would have been. Logically that would, you would think if he had, if he looked at this memorandum and said, you know, this is a case where we have to, we have to figure out this business about, you know, how the, how the rule with six 12, um, you know, how it overlaps or, or how it intersects with, um, attorney client privilege or work product or anything, because I don't even think that the triggering predicate of, of six 12 is met. I agree justice. And I,  that was going to be the point you're making was going to be, the first point I was going to make, I was prepared to have the discussion about how six 12 and the attorney, client privilege and work product. That's a whole nother animal because the facts here, I couldn't agree more. Don't get us to that kind of second discussion. And there's not a lot. There's not a lot done to my eye in the deposition of, of Mr. Friedland to establish, you know, the predicates is six 12 to ask him very direct questions about whether this helped him refresh his recollection on these matters that are disputed and are pertinent and all that. So there's, there's some reading between the lines that needs to happen, but it's not, it's not the best, best record for the proposition that there's, there's a compelled disclosure here. I agree. I mean, there were certain poignant questions I think that should, that needed to be asked. I'm not being critical of anybody, um, in order to trigger six 12, um, they weren't asked in the deposition. So I think it ends there. Um, and the other point I guess I would make,  about that is there was also no showing in there in the record or in their briefs that,  this memorandum would have somehow affected the outcome. Um, I think the record is devoid of that as well, which doesn't relate to kind of the six 12 question directly, but just more,  from a use of discretion standpoint with this disclosure, and how would this disclosure change the ultimate outcome? Was there ever a request for the judge to review that document in camera? I know that's an issue on appeal, but I couldn't tell if there was ever a specific request to review it in camera, as opposed to just expecting a sua sponte review. I don't believe there was, but I, I I'm not for sure on that justice. I know I never offered to, for them to review it in camera, which sometimes the six 12 burden isn't yours. That's right. That's right. Okay. So a couple of affirmative points that I'd like to make, um, and I I'll be brief, but I want to kind of start from the, the end damages and, and approximate cause the entire case justices is based on this 470 grand that they say, um, signal what it got, uh, but for some conduct of sugar fells involved and what judge Levco did and what the evidence. Is that the sum total of the eager and shy investments that that's exactly right. And legal fees and fees. No, the fees are a little bit above the four seven. Okay. Yeah.  so, but the, the, the crux of it is if there's no, if the four 70 isn't, uh, if they can't show that that four 70 would have went in and created damages, then the legal fees, you know, are not, are not, I don't think relevant to the damages because at that point, uh, the legal fees had nothing to do with what sugar fells involved in that we did. And that's the point, um, the three points on the approximate cause and damages, uh, would ultra, the question is what ultra Matt eager and Mr. Shaw have invested, but for what sugar fells involved in. And if you look at the record justices, the testimony, number one, I guess point one would be eager and Shaw both said, I don't know what we would have done. Um, it's pure speculation as to whether or not we would have ultimately invested in signal,  at that point in time. So their testimony is clear on that. I mean, Mr. Eager is a small, um, investment equity investment fund. Uh, he has high interest rates is in the record.  at the time should, uh, signal had one,  uh, funding and that was their own business. Seven, seven,  And so to me, it didn't appear that ultra and Shaw, Shaw, I can point out briefly. I mean, he's an individual investor. Nobody knew who he was justices. Um, and he didn't know who signal was. And he said, I had no idea even what, you know, pre-funding settlement litigation litigation was. So I invested in Ms. Jaffrey. So I respected this. Yeah. When you're referring to testimony, it's these here affidavits you're talking about, correct? Correct. It didn't seem that the district court considered the expert testimony of David. How, who I think was their CEO about the impact on the loss of investments here. Is that fair? And why wouldn't that impact things? Yes, that, that is fair. Uh, the district did not consider it and here's why it wouldn't impact it. Because his analysis was purely on, assume we got the force, $170,000. His analysis didn't have to do with any, his opinion didn't have to do with whether or not they would have, or should have received it before sugar fells involved. So once you have that line drawn, that there was nothing sugar, sugar fells, it all did to create them losing that investment. Then what Mr. Huff says about the complete damages, your honor, I don't think is relevant to anything because the case would be is over right there. And I would take it a step further. And my kind of, I guess I'm jumping around a little bit. So I apologize for that justice, but as far as Mr. Huff's opinion goes another, I think if you were to consider it, another hole in that is that they haven't shown they needed the 470,000. So what Mr. Huff said is if we had an extra 470,000, we would have been able to get this profit. However, and this is maybe me thinking a little bit outside the box head bay, they have to show they needed it. They had funding from seven, seven,  So in other words, they would have to show they missed out on giving funding loans, pre-funding loans, because they didn't have this money and nowhere in Mr. Huff's opinion, does he say, you know, client X, Y, and Z came to us asking for a pre-litigation loan and we couldn't give it to him because we didn't have the financing. And there's no testimony in the record that had we received the financing from specifically ultra and Mr. Shaw, we would have been able to fund additional loans. He just takes, says, take afforded 70,000. We have, or can use, and then extrapolates that out into the lost profits. And that's kind of a, I don't want to call it an ancillary argument justices, but I think it's, if you were to consider Mr. Huff's opinion, that would be something you could consider a couple of final points. It goes both ways. There's no evidence. Signal would have accepted an investment from old truck or Shaw. I mean, they flat out said, Mr. Art arson, EGIS is one of their financial guys said, I don't, I don't know what would have ultimately happened had we engaged. Oh, sure. Mr. Shaw. And the point that I would make on that is it's not a case where signal was talking with ultra and Shaw Farber comes on. Ms. Joffrey, excuse me, comes along and starts these companies. And all of a sudden now there's a jousting who's going to get these investors. I mean, that goes kind of to the, the index, uh, POTUS, POTUS, POTUS, the case where the court said in the first district justice that, um, well look, okay, so you started a new company, you got funding. Who's to say these guys didn't, the plaintiff didn't try to get that funding. So how are we supposed to make that proximate cause jump? And that's the problem in this case. Justices is that they can't make that proximate cause to damages. So, um, the, the, the own testimony and also Mr. Alfala. And I think this is somewhat compelling, even up through, you know, they say, Oh, we were looking for outside investors, but even up through 2021, when he was deposed, he tells me we still don't have any outside investors. It's still seven, seven,  So, uh, I look at that and I say, how can you then say that they would have get one after ultra and Shaw at that point. And to take it even a step further, looking specifically at the record justices, you remember Ms. Joffrey, when she received the general email, if there's any argument, well, maybe they got an inquiry from ultra. So why wouldn't that be evidence that in fact, ultra was interested in signal. That email was sent on to John gentleman named, I think, Jason or Josh wander. But in any event, the owner of seven, seven,  who had direct involvement with signal and he ignored it. There was no pursuit of ultra and Mr. Eager. So again, that is, I think pretty clear evidence that no reasonable jury could find that whatever sugar fells and felt that it was the approximate cause of damage. And then,  and I don't want to, I don't, I'm not trying to quote the district court opinion, but to take it one step further. Um, okay. Say they, and we don't think they were, but say sugar did something wrong in creating these companies. Um, and maybe telling Ms. Joffrey, you're not going to get sued. Um, and she relays that to Mr. Eager, that would be nothing more than creating a condition of negligence in the condition. And that goes to the Abrams case. Um, and also the garris. The case where creating a condition where there may be some ultimate damage is not, and cannot be the proximate cause. And I think just as, just as the Abrams case is a great example, it's a sad case because ultimately resulted in a death, but where the city of Chicago didn't, didn't answer, didn't bring an ambulance. And then ultimately the family had to drive, uh, the, you know, their child to the, to the hospital and they ended up getting hit by, by a drunk driver. And so that, that the input of that case was, well, look, the city probably should have had somebody out there.  it didn't make a difference. Um, one final point on punitive damages. We see this argument a lot where they try to say the fraud, you know, is, is completely separate here. This revolves around this conflict disclosures. These are all legal services, justices. These are all in the context of that. So the cases where they've allowed punitives on fraud, it's the cripe, the lighter case where a lawyer flat out lied about Billy. Um, and then there's other cases where there was, you know, improper relationships with the client. Those are the type of cases where they say punitive damages. So I think, uh, for all those reasons, uh, and the reasons that you have pointed out to,  the judgment of the district court should be affirmed. One last question for you, please. Do you have any concerns about jurisdiction? I do not. I think,  justice, you put it perfectly that I think everything's been wrapped up into this. Yeah, there's that there. And I think you all both agree. Tell me, tell me, I think Mr. Geek is, um, clear on this. There's nothing left in the district court whatsoever. That's right. Right. And the, everything is subsumed either within the 54 B partial judgment or the, I don't remember the number 10 17, is it? Yeah. I think it's 10 17. Yeah. Or 27. Yeah. But between these two docket, between these two docket numbers, everything is subsumed and everything in the appeal falls with under the  docket numbers.  Justice. Yeah. Okay. Okay. Very well. Thank you, Mr. Thomas B. Thanks to you. Thank you. Um, to deal with the question that you asked about the effect of the dismissal. If you look at page 14, uh, judge, uh, let's go decision. You'll see that she said the only thing left for fraudulent concealment has to do with attorney's fees that were paid after the day of the, of October 20th, of which there was none. So she allowed us to make a claim for which there were no supporting facts. And that basically terminated the fraudulent concealment claim, uh, misrepresentation, whichever it was on the question that you asked, uh, judge St. Eve about in-camera submission. If you look at the appendix on page 26, attached to the main brief, there's a footnote in the magistrate judges, uh, order that says, plaintiff also asked that a copy of the documents be submitted to the court. For an in-camera review,  et cetera, to preserve the issue for the eventuality of an appeal. The court declines the plaintiff's, uh,  however, because the application of the relevant factors does not depend on the content of the documented issue. And nor is an in-camera review necessary to preserve the appellate issue. And we believe that that is absolutely mistaken. If you had the material, the narrative here, you'd be able to tell. Uh, I think in comparison, uh, to the testimony as to whether or not, uh, it refreshed recollection, which now goes to the point that your honor just made about no evidence in the, in the record that, uh, Mr. Uh, Friedland's never said, and it was never questioned about, did it refresh your recollection? And indeed there is some support, some support in the law. And we cite one of the cases against us, actually, uh, in which it said, if you don't ask, if you did it refresh the recollection, you're out of luck. We think that's the long rule. The fact of the matter is that what happened here is this fella, um, read this narrative in preparation for the deposition. And that should be enough, at least for an in-camera submission of it to make a determination because after all, six, 12 make a determination as to what I'm sorry, make a determination as to what as to whether or not it, it, in fact, refresh the guy's recollection. And just if I could go on and say, they're no longer, as we understood in the lower court, asserting an attorney client privilege protection of the rule. They're only asserting work product and work product can be pierced on a showing of prejudice. Indeed, their brief says that we didn't show prejudice, which is completely wrong. If you look at our reply brief, we have page and a half of footnotes that show the number of times that the respondent lawyers in this case said, I don't recall. I don't recall. I don't recall. It's at least 75 separate times that has been deemed a sufficient justification. And we cite the cases in our reply brief that has been deemed a sufficient justification to require the production of a document over which work product is claimed. They also say that this is a fishing expedition for councils, files and records. And a lot of the law about the production of these things has to do with the dislike of fishing expedition. This is not a fishing expedition for council's record. This is a document that was written by the fella at the time. This is his own statement. So we're not looking for anything from the lawyers. We're looking for his own statement and rule six 12 talks about the interest of justice in the interest of justice, given the fact that the complexity and the distance of time between the original events and the repeated assertions by the individual lawyers that they have no recall, it seems to us that there's a very compelling interest of justice argument for the production. And we think the suggestion that you have to show that the witness has to say, it didn't refresh my recollection. You know, a witness who says that there's, there's no ability to cross examine or to test that assertion. And it seems to us that that is not in the interest of justice. I hope you understand my last point. Yeah, I do. Okay. Mr. Geek is thanks to you. Um, we'll take the appeal, uh, under advisement. Appreciate the work of old council. We'll proceed to our second.